IN THE COURT OF APPEALS OF TENNESSEE
AT NASHVILLE
August 5, 2020 Session

## HARPETH FINANCIAL SERVICES LLC v. JIM CLAY PINSON, JR. ET AL.

**Appeal from the Circuit Court for Davidson County**
**No. 19C1995     Kelvin D. Jones, Judge**

———————————————————

### No. M2019-02106-COA-R3-CV

———————————————————

A collecting bank sued the drawer of a check, claiming that the drawer stopped payment on the check with fraudulent intent.  The general sessions court, as well as the circuit court on de novo appeal, ruled in favor of the drawer.  The bank argues that, because it was a holder in due course, the drawer was still liable on the check despite the stop-payment order.  And it seeks an award of interest, court costs, attorney's fees, and treble damages from the drawer, contending that the proof showed the drawer acted with fraudulent intent.  We affirm the dismissal of the claim based on the drawer's alleged fraudulent intent, but we vacate the dismissal of any claim based on the drawer's obligation on the check.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed in Part and Vacated in Part**

W. NEAL MCBRAYER, J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ANDY D. BENNETT, J., joined.

John Roaten Cheadle, Jr. and Mary Barnard Cheadle, Nashville, Tennessee, for the appellant, Harpeth Financial Services LLC.

Kimberly Reed-Bracey Johnson, Goodlettsville, Tennessee, for the appellee, Flora E. Morris.

### OPINION

### I.

A customer of Harpeth Financial Services LLC wanted to cash a check.  The check, signed by Flora E. Morris and payable to "Jim Tinson Elec Ser," was for $3,000.  Harpeth asked the customer for his identification and Ms. Morris's phone number.  The customer

identified himself as Jimmy Clay Pinson, Jr. and provided a phone number. But when Harpeth called the number, there was no answer. When Harpeth asked for another number to reach Ms. Morris, Mr. Pinson could not provide one. So Mr. Pinson left without cashing the check.

He returned less than ten minutes later, providing the same phone number for Ms. Morris as before. But this time, Harpeth got an answer when it called. Harpeth supposedly reached Ms. Morris and verified the check, as well as Ms. Morris's identity. Harpeth then cashed the check, giving Mr. Pinson the $3,000. When Harpeth later tried to collect on the check from Ms. Morris's bank, the check was returned, showing a stop-payment request.

Harpeth sued both Mr. Pinson and Ms. Morris in general sessions court. Harpeth claimed Ms. Morris fraudulently stopped payment on her check after validating it. *See* Tenn. Code Ann. § 47-29-101(a) (2013) (providing remedies to the holder of a check when the check's maker stops payment on the check with fraudulent intent). From Ms. Morris, Harpeth sought the $3,000 face amount of the check plus interest, treble damages, court costs, and attorney's fees. *See id.* § 47-29-101(a)(1)-(2), (a)(4)-(5), (d).

Mr. Pinson was never served, and he is not a party to this case. For her part, Ms. Morris claimed that she hired a man named Jim Tinson to perform electrical work at her property. Ms. Morris wrote the check to "Jim Tinson Elec Ser" on a Saturday. In exchange, Mr. Tinson was supposed to complete the work the following Monday. But he did not show.

Believing she had been defrauded, Ms. Morris claimed she stopped payment on the check two days before Mr. Pinson cashed it. She insisted that she was justified in doing so and that Harpeth did not verify the check with her. She argued that, if Harpeth had contacted her bank before taking the check, Harpeth would have been aware of the fraud and the stop-payment request. In Ms. Morris's view, Harpeth assumed the risk of taking the check and paying Mr. Pinson.

After a hearing, the general sessions court dismissed Harpeth's claim against Ms. Morris. Harpeth then appealed to circuit court for a new trial. *See id.* § 27-5-108(a)(1), (c) (Supp. 2020) (allowing a party to "appeal from a decision of the general sessions court to the circuit court," where the appeal "shall be heard de novo"). After a bench trial, the circuit court likewise dismissed Harpeth's claim. The court reasoned that the check was payable to "Jim Tinson Elec Ser." Yet Harpeth paid the check to a "Jimmy Clay Pinson, Jr." By failing to pay the "actual payee," Harpeth acted "at its own peril" and thus was "responsible for the loss." *See McCann Steel Co. v. Third Nat'l Bank*, 337 S.W.2d 886, 891 (Tenn. Ct. App. 1960) (noting the "general rule of law . . . that a bank must, at its peril, pay a check to the actual payee or upon his genuine [i]ndorsement; and, if it fail to do so

2

from mistaking the identity of the payee, or by paying upon a forged [i]ndorsement, it is responsible for the loss").

## II.

### A.

On appeal, Harpeth argues that it was a holder in due course of Ms. Morris's check. Ms. Morris had the right to stop payment on the check. *See* Tenn. Code Ann. § 47-4-403(a) (2001) (allowing a "customer or any person authorized to draw" on a bank account to "stop payment of any item drawn on the . . . account"). But if Harpeth was a holder in due course, Ms. Morris remained liable on the check. *See id.* cmt. 7 (explaining that a "drawer remains liable on [an] instrument to [a] holder in due course" (citing *id.* §§ 47-3-305, -414 (2001)).

A "holder in due course" is defined by statute. *See id.* § 47-3-302(a) (2001). Whether the facts established in the trial court "satisfy the statutory standard" is a mixed question of law and fact. *See Pullman-Standard v. Swint*, 456 U.S. 273, 289 n.19 (1982) (A mixed question of law and fact is a "question[] in which the historical facts are admitted or established, the rule of law is undisputed, and the issue is whether the facts satisfy the statutory standard, or to put it another way, whether the rule of law as applied to the established facts is or is not violated." ). Cases "that involve mixed questions of law and fact are subject to de novo review." *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

The burden falls on the party claiming holder in due course status to prove the statutory requirements of that status. *Braswell v. Tindall*, 294 S.W.2d 685, 688 (Tenn. 1956). The first requirement is that the party be a "holder." *See* Tenn. Code Ann. § 47-3-302(a); *see also* 5A DAVID FRISCH, ANDERSON ON THE UNIFORM COMMERCIAL CODE § 3-302:9 (3d. ed.), Westlaw (database updated Dec. 2020) (recognizing, "[i]n a suit on commercial paper, the burden is initially on the plaintiff to show that the plaintiff is the holder of the instrument sued upon"). A holder is a person "[i]n possession of a negotiable instrument that is payable either to bearer or to an identified person that is the person in possession[.]" Tenn. Code Ann. § 47-1-201(b)(21)(A) (Supp. 2020).

The parties do not dispute that Harpeth is in possession of Ms. Morris's check and that it is a negotiable instrument. *See id.* § 47-3-104(c), (f) (Supp. 2020) (recognizing a check may be an instrument). But the check was payable only to the order of "Jim Tinson Elec Ser," not to Harpeth. *See id.* § 47-3-109(b) (2001).

A check may become payable to bearer if it is "indorsed in blank." *Id.* §§ 47-1-201(b)(5), -3-109(c). The trial court ruled that, because Mr. Pinson was not the actual payee of the check, Harpeth could not recover from Ms. Morris, relying on our decision in *McCann Steel Co. v. Third National Bank*, 337 S.W.2d 886 (Tenn. Ct. App. 1960). Implicit in the court's reliance on *McCann Steel Co.* is a determination that Mr. Pinson was not

only the wrong payee, but also not a proper indorser on behalf of Jim Tinson Elec Ser. *See McCann Steel Co.*, 337 S.W.2d at 891 (recognizing the bank may "pay a check to the actual payee or upon his genuine [i]ndorsement").

We disagree. In her answer to the civil warrant filed in general session court, Ms. Morris did not specifically deny either the authenticity of Mr. Pinson's signature or his authority to indorse the check. So "the authenticity of, and authority to make," his signature were deemed admitted. Tenn. Code Ann. § 47-3-308(a) (Supp. 2020). More importantly, Ms. Morris complained that Mr. Pinson "took [her] check on a Saturday and allegedly [i]ndorsed it, cashed it, and did not return to do any of the work for a period of near four years as he had promised." According to her, Mr. Pinson "'took the money and ran'" without calling or reappearing "to make any amends or refunds."

The person or entity to whom a check "is initially payable is determined by the intent of the person . . . signing as . . . the issuer of the instrument." *Id.* § 47-3-110(a) (2001). This is true "even if that person is identified in the [check] by a name or other identification that is not that of the intended person." *Id.* By her answer, Ms. Morris acknowledged her intent was to pay Mr. Pinson, although her check was made payable to "Jim Tinson Elec Ser." When a check "is payable to a holder under a name that is not the name of the holder, [i]ndorsement may be made by the holder in the name stated in the instrument or in the holder's name or both." *Id.* § 47-3-204(d) (2001). In other words, Mr. Pinson properly indorsed Ms. Morris's check in his own name.[1]

Ms. Morris argues that, even if her check was properly indorsed by Mr. Pinson, Harpeth did not take the check in good faith. To be a holder in due course, the holder must have taken the instrument, here a check, "in good faith." *Id.* § 47-3-302(a)(2). Good faith "means honesty in fact in the conduct or transaction concerned." *Id.* § 47-1-201(b)(20). "Honesty in fact," in turn, means "an absence of a 'knowing or reckless disregard of a customer's rights.'" *The Bank/First Citizens Bank v. Citizens & Assocs.*, 82 S.W.3d 259, 264 (Tenn. 2002) (quoting *Glazer v. First Am. Nat'l Bank*, 930 S.W.2d 546, 549 (Tenn. 1996)). A party acts in good faith "unless [its] conduct amounts to dishonesty and bad faith." *McConnico v. Third Nat'l Bank*, 499 S.W.2d 874, 881 (Tenn. 1973).

"Honesty in fact" is a subjective standard in Tennessee. *The Bank/First Citizens Bank*, 82 S.W.3d at 264. Ms. Morris's argument relies on a standard that incorporates "an objective component"—whether there was an "observance of reasonable commercial standards of fair dealing." *See Any Kind Checks Cashed, Inc. v. Talcott*, 830 So. 2d 160, 165 (Fla. Dist. Ct. App. 2002) (citation omitted). The Uniform Commercial Code added

---

[1] Harpeth could have required Mr. Pinson to indorse the check using both "Jim Tinson Elec Ser" and his own name. *See* Tenn. Code Ann. § 47-3-204(d). "[B]ecause an [i]ndorsement in a name different from that used in the instrument may raise a question about its validity and an [i]ndorsement in a name that is not the correct name of the payee may raise a problem of identifying the [i]ndorser," requiring the indorsement in both names is "the accepted commercial practice." *Id.* cmt. 3.

4

this objective component to the definition of good faith in 1990. *The Bank/First Citizens Bank*, 82 S.W.3d at 263-64. But Tennessee has not adopted it. *See id.* at 264. In Tennessee, a holder in due course need not observe reasonable commercial standards "in addition to 'honesty in fact' to be in good faith." *McConnico*, 499 S.W.2d at 881.

In her brief, Ms. Morris lists facts that she claims conclusively establish that Harpeth did not act in good faith:

> [Harpeth] first denied their customer and requested another phone number from their customer to contact [Ms. Morris];
>
> [Harpeth's] customer returned and provided the very same number;
>
> The number [Harpeth's] customer provided was not the number of [Ms. Morris] and had never been her number;
>
> [Harpeth] claims to have verified [Ms. Morris's] social security number and date of birth but never wrote it in their file and admitted that they had no way to know [Ms. Morris's] actual social security number and date of birth to ascertain if it was even accurate;
>
> [Ms. Morris] claimed she did not speak with [Harpeth] on said date;
>
> [Harpeth] admitted that [it] did not call the bank to check to see if the check had been stopped and that it was not their practice to do so;
>
> [Harpeth] was on notice that their own customer had a bad check history with them on prior occasions;
>
> [Harpeth] wants the Court to believe that all the activities they claim occurred were chronicled in their record in real-time and took place in four minutes; [and]
>
> [Harpeth's] record has the check being cashed and approved prior to the claim that they called and spoke with [Ms. Morris.].[2]

---

[2] Ms. Morris's list concludes with the claim that Harpeth only asserted liability under one statute but argued the application of another statute at trial. Ms. Morris does not elaborate on this point. In the general sessions warrant, Harpeth only references the bad check statute, Tennessee Code Annotated § 47-29-101, and not Tennessee Code Annotated § 47-3-414, the obligation of a drawer on an unaccepted draft. We note that "the rules governing pleadings" apply to a lesser extent in general sessions court than in circuit court, *Vinson v. Mills*, 530 S.W.2d 761, 765 (Tenn. 1975), and claims may be tried by implied consent, *Zack Cheek Builders, Inc. v. McLeod*, 597 S.W.2d 888, 890 (Tenn. 1980). On remand, Ms. Morris may argue that Harpeth limited its claim against her to the bad check statute.

Although Harpeth concedes that Mr. Pinson "had previously cashed checks with Harpeth that had been returned 'stop payment'" and the statement of evidence[3] supports some of the facts relied on by Ms. Morris, none of the facts independently or in combination would necessarily preclude a finding that Harpeth acted in good faith in taking Ms. Morris's check.

Harpeth urges us to find that it is a holder in due course. The problem is that the trial court stopped its analysis with the question of whether Harpeth was a holder. Tenn. Code Ann. § 47-1-201(b)(21)(A). Concluding that Harpeth could not be a holder based on an improper indorser, the court did not address the other requirements for being a holder in due course. *See id.* § 47-3-302(a). And the statement of evidence approved by the court does not address Harpeth's proof on those questions.

Under the circumstances, a remand is necessary for the court to make additional findings of fact and conclusions of law regarding Harpeth's claimed status as a holder in due course. If the court determines that Harpeth is a holder in due course, the court should also make findings of fact and conclusions of law regarding any defenses raised by Ms. Morris that may be available against a holder in due course. *See id.* § 47-3-305(b).

B.

Regardless of whether Harpeth was a holder in due course, Harpeth is not entitled to interest, treble damages, court costs, or attorney's fees under Tennessee Code Annotated § 47-29-101, the bad check statute. *See id.* § 47-29-101(a)(2), (a)(4)-(5), (d). That statute requires proof that the drawer, with fraudulent intent, "stop[ped] payment on the check." *Id.* § 47-29-101(a).

Here, Ms. Morris issued the check on a Saturday in exchange for electrical work to be completed the following Monday. When Mr. Pinson did not show on Monday, Ms. Morris stopped payment on the check, two days before Mr. Pinson tried to cash it.[4]

---

[3] On appeal, Harpeth complains about the accuracy of the statement of the evidence. But "[a]bsent extraordinary circumstances, the determination of the trial court [that the statement of the evidence is an accurate account of the proceedings] is conclusive." Tenn. R. App. P. 24(c), (e).

[4] At trial, Harpeth contended that Ms. Morris did not stop payment on the check until after it attempted to collect and that the check was first returned for insufficient funds. The bad check statute permits recovery when a drawer, with fraudulent intent, "allows the check . . . to be dishonored by a financial institution because of lack of funds." Tenn. Code Ann. § 47-29-101(a). Fraudulent intent "may be inferred as provided" in the criminal statutes. *Id.* Such an inference may arise when a check is refused for insufficient funds within thirty days after issuance and the drawer does not pay the holder within ten days of receiving notice of the dishonor. *Id.* § 39-14-121(b)(2). Although the record contains some

Stopping payment on the check only after Mr. Pinson failed to fulfill his obligations was not fraudulent. *See* Tenn. Code Ann. § 39-14-121(a)(1)(B) (2018); *cf. State v. Russell*, 382 S.W.3d 312, 316 (Tenn. 2012) (holding that knowingly "canceling payment for . . . services received when those . . . services were as represented" amounts to fraudulent intent).

## III.

Because Harpeth failed to establish that Ms. Morris fraudulently stopped payment on the check or allowed the check to be dishonored due to insufficient funds, Harpeth cannot recover under the bad check statute. So we affirm the dismissal of its claim based on Tennessee Code Annotated § 47-29-101. We vacate the dismissal of any claim for drawer liability under Tennessee Code Annotated § 47-3-414. The case is remanded for additional findings of fact and conclusions of law and such further proceedings as may be necessary and consistent with this opinion.

_____s/ W. Neal McBrayer_____
W. NEAL MCBRAYER, JUDGE

---

evidence that the check was returned for insufficient funds, the evidence does not preponderate against the trial court's finding that the stop-payment order came first. *See* Tenn. R. App. P. 13(d).