**BANCO GANADERO y AGRICOLA, S.A., AGUA PRIETA, SONORA, MEXICO, Plaintiff,**

v.

**SOCIETY NATIONAL BANK OF CLEVELAND, Cleveland, OHIO, Defendant.**

**Civ. A. No. C 75–505.**

United States District Court, N. D. Ohio, E. D.

Aug. 2, 1976.

William S. Burton, Arter & Hadden, Cleveland, Ohio, Woodrow W. Bean II, Bean, Zaveleta & Rosado, C.P., El Paso, Tex., for plaintiffs.

S. Stuart Eilers, Thompson, Hine & Flory, Cleveland, Ohio, for defendants.

## MEMORANDUM AND ORDER

WILLIAM K. THOMAS, District Judge.

With jurisdiction in this court based upon diversity of citizenship, Banco Ganadero y Agricola, S. A., Agua Prieta, Sonora, Mexico (hereafter Banco G) sues Society National Bank of Cleveland (SNB) for $73,200, the face amount of an SNB cashier's check, plus interest. Plaintiff alleges in paragraph 4 of its complaint, and defendant admits in its answer:

> On September 27, 1974 defendant SNB issued and forwarded to plaintiff BANCO G., its cashier's check No. 0299271, payable to Enesta [Ernesto] Valenzuela, in the amount of $73,200.

Plaintiff further alleges in paragraph 5 (denied by defendant's answer):

> On October 4, 1974 plaintiff BANCO G. took the SNB cashier's check No. 0299271 for value, in good faith and without notice of any defense or claim as to it on the part of any person.

Plaintiff further alleges in paragraph 6:

> Thereafter, upon presentment of the SNB cashier's check No. 0299271 to de-

fendant SNB, by or on behalf of plaintiff BANCO G., with all prior endorsements guaranteed by plaintiff BANCO G., defendant SNB dishonored its cashier's check No. 0299271 and, to date, defendant SNB has refused and has continued to refuse to honor its cashier's check No. 0299271.

Responding, defendant states:

6. Without intending to deny that it has dishonored the cashier's check in question and refused to pay the same, defendant denies the allegations of Paragraph 6 of the complaint.

7. As and for an affirmative defense, defendant says there has been a failure of consideration and that, by reason thereof, plaintiff is barred or otherwise precluded from recovering herein.

Banco G has moved for summary judgment for the amount claimed, basing its motion

. . . upon the pleadings, answers to interrogatories, and documentation produced by defendant Society National Bank pursuant to discovery proceedings.

The documentation includes the check of Header General, Inc. of El Paso, Texas (Header), dated September 12, 1974, drawn on its SNB account, to the order of Ernesto Valenzuela in the amount of $73,200; Banco G's written remittance instructions to SNB concerning the check; copies of the front and back sides of SNB's "Cashier's Check;" SNB's bank statement of Header for September and October 1974; a deposit slip of Banco G to the account of Ernesto Valenzuela Frisby, entering the SNB check in the amount of $73,200; and Banco G's statement of the checking account of Ernesto Valenzuela for October. The interrogatory answers of SNB are supplemented by admissions of counsel made in briefs or letters, or the several oral hearings.

### I.

While undisputed facts will be interspersed throughout the opinion, it will be helpful to the discussion of the issues if preliminarily the principal events are sketched chronologically. The Header check, drawn on its account at SNB, in the amount of $73,200, payable to Ernesto Valenzuela, was presented on September 17, 1974, by Valenzuela to Banco G, where he had a checking account. Upon presentment of the Header check, Banco G forwarded the check to SNB with instructions "kindly remit your check as folows [sic] to Banco Ganadero y Agricola S. A. . . . P. O. Box 992, Douglas, Arizona." Having charged $73,200 against the account of its depositor, Header, SNB on September 27, 1974, issued its cashier's check (No. 0299271) for $73,200, payable to Enesta [sic] Valenzuela. Upon receipt of the SNB cashier's check Banco G, on October 4, 1974, credited the checking account of Valenzuela with a deposit of $73,200. On October 10, 1974, Banco G presented the SNB cashier's check (No. 0299271) to SNB for collection, bearing the unrestricted endorsement of Banco G, "Pay to the order of any Bank, Banker or Trust Co., prior endorsements guaranteed."

Also on October 10, 1974, SNB was advised that a check credited to the Header account on September 27, 1974, issued by Financial Relations, Inc., payable to Header, had been dishonored for insufficient funds by the University Bank in El Paso, Texas. This produced an overdraft in the Header account.

The cashier's check was then returned to Banco G because it lacked the personal endorsement of the payee, Valenzuela. When Banco G subsequently presented the check, bearing Valenzuela's endorsement, on October 28, 1974, November 25, 1974, and January 14, 1975, SNB dishonored the check on each occasion.

### II.

In seeking summary judgment Banco G insists that, having drawn its cashier's check on itself, SNB is precluded from dishonoring its own check when presented to SNB for collection by Banco G.

Numerous cases may be found, including some from Ohio, in which a cashier's check is characterized as a bill of exchange drawn

by a bank upon itself and accepted in advance by the act of its issuance.[1] Decisions predating the U.C.C. employed this characterization. Since the coming of the U.C.C. cases have continued to treat cashier's checks as bills of exchange, accepted by the act of issuance, and have found applicable section 4–303 of the U.C.C. Adopted in Ohio as Ohio Rev.Code § 1304.23, this section provides:

> (A) Any knowledge, notice, or stop-order received by, legal process served upon or setoff exercised by a payor bank, whether or not effective under other rules of law to terminate, suspend, or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend, or modify such right or duty if the knowledge, notice, stop-order or legal process is received or served and a reasonable time for the bank to act thereon expires or the setoff is exercised after the bank has done any of the following:
>
> (1) accepted or certified the item;
> . . . .

With regard to an ordinary check, the language of section 1304.23 is subject to straightforward interpretation. The drawer of the check, the section provides, may not require his drawee bank to stop payment on the check after the bank has, *inter alia,* accepted the check for payment. In the case of a bank draft drawn on another bank, sometimes loosely referred to as a cashier's check,[2] this section prevents the drawer bank from stopping payment on the check once the drawee bank has accepted it.

When the drawee and the drawer bank are the same, however, the foregoing analysis breaks down. Application of section 1304.23 to a cashier's check, when described as an instrument accepted upon issuance, would seem to indicate that the bank, as *drawer,* cannot under any circumstances countermand the check because the same bank, as *drawee,* has already accepted it. Indeed, a number of cases have applied U.C.C. § 4–303 to the analysis of cashier's checks to reach such a conclusion.[3]

On the other hand, in *TPO Inc. v. Federal Deposit Ins. Corp.,* 487 F.2d 131, 135–36 (3 Cir. 1973), the court observes that, under the U.C.C., a cashier's check "is the equivalent of a note." This conclusion follows from the second sentence of Ohio Rev.Code § 1303.17 (U.C.C. § 3–118), which provides that "[a] ·draft drawn on the drawer is effective as a note."

■ Were it not for the difficulties caused by section 4–303 when a cashier's check is looked upon as a draft or bill of exchange, this difference in characterization would have little practical effect. Under Ohio Rev.Code § 1303.49 (U.C.C. § 3–413) the contracts of a maker (of a note) and acceptor (of a draft) are identical: Each engages that he will "pay the instrument according to its tenor at the time of his engagement or as completed . . .·" Thus whether a bank is considered to have accepted a cashier's check, as a draft, by the act of its issuance, or is considered to be the maker of a note, it is primarily obligated upon the instrument. However, it is also well established, even when a cashier's

---

1. For a thorough compilation of the cases, see 6 *Michie on Banks and Banking,* 359 n.75 (2d Ed. 1975). The following Ohio cases accept this characterization: *Society Natl. Bank of Cleveland v. Capital Natl. Bank,* 30 Ohio App.2d 1, 59 Ohio Op.2d 1, 281 N.E.2d 563 (Cuyahoga Co. 1972); *Cross v. Exchange Bank Co.,* 110 Ohio App. 219, 168 N.E.2d 910 (Summit Co. 1958); *Leo Syntax Auto Sales, Inc. v. Peoples Bank & Sav. Co.,* 6 Ohio Misc. 226, 215 N.E.2d 68 (Tuscarawas Co. C.P. 1965).

 Additionally, the following federal court cases have so characterized cashiers' checks and been the focus of analysis and comment in the briefs filed in this case: *Munson v. American Nat'l Bank & Trust Co. of Chicago,* 484 F.2d 620 (7 Cir. 1973); *State of Pa. v. Curtiss Nat'l Bank of Miami Springs,* 427 F.2d 395, 398 (5 Cir. 1970); *Kaufman v. Chase Manhattan Bank,* 370 F.Supp. 279 (S.D.N.Y.1974).

2. *See* Annotation, "Right to countermand or stop payment on cashier's check or check or draft drawn by one bank upon another," 107 ALR 1463 (1937).

3. See, *e. g.,* the federal cases cited in note 1, *supra.*

check is characterized as a bill of exchange,[4] that a bank may assert failure of consideration as a defense to a demand that it pay a cashier's check, if enforcement is sought by one who is not a holder in due course. This has been regularly found to be the case in situations where a bank erroneously issues a cashier's check in exchange for a regular check after payment on the regular check has been stopped.[5]

These cases refute plaintiff's absolute position that the bank issuing a cashier's check cannot under any circumstances dishonor it except for fraud.

■ Treating a cashier's check as the bank's promissory note, the question becomes not whether the bank may stop payment thereon—for stopping payment only makes sense as a concept where a drawer wishes to prevent the drawee, another party, from paying the instrument—but rather whether the bank, as maker of the instrument, is liable thereon.[6] Therefore, it is concluded that a cashier's check drawn by a bank on itself is more accurately treated as a note than as an "accepted" check. So concluding, it is pertinent to invoke the U.C.C. rule that as against one who is not a holder in due course, the maker of a note may assert the defense of failure of consideration. Ohio Rev.Code §§ 1303.35 and 1303.44 (U.C.C. §§ 3–306 and 3–408). Although Banco G claims the status of a holder in due course in its motion for sum-

mary judgment, the facts of this record are insufficient to determine whether or not Banco G actually occupies such a position. Hence the question that now needs to be resolved is whether the undisputed facts of this record establish a failure of consideration.

### III.

Ohio Rev.Code § 1304.01(A)(15) (U.C.C. § 4–105(d)) provides that the term "collecting bank" "means any bank handling [an] item for collection except the payor bank." In this instance Banco G was clearly a collecting bank. Section 1304.17 (U.C.C. § 4–211) specifies the means by which a payor bank may remit proceeds to pay a check presented by a collecting bank. It is true that comment 2 to section 1304.17 states: "A check drawn on the remitting bank is not approved [as a form of remittance discharging the collecting bank from responsibility if the remittance itself is not paid] because this would merely be substituting for the original item another item on the same payor."

■ However, the comments considered in conjunction with paragraph (C) of section 1304.17 establish that the bank receiving the remittance, or settlement, may authorize the use of a cashier's check as a remittance instrument. Indeed, such was done in this case when Banco G requested that SNB "remit your check." [7]

---

4. Having described a cashier's check as a draft accepted by the act of issuance, for instance, and alluded to § 4–303, the court in *State of Pa. v. Curtiss Nat'l Bank, supra* n.1, said, "Assuming *arguendo* that Bankers Allied [in whose shoes the State of Pennsylvania stood] was not a holder in due course, the Bank is entitled to defend on the ground of lack or failure of consideration. *See* U.C.C. §§ 3–306 and 3–408 . . . ." 427 F.2d at 399 (footnote omitted).

In considering the interplay of §§ 3–306 and 3–408 with § 4–303, it must be remembered that, "The provisions of [Article 3] are subject to the provisions of the Article on Bank Deposits and Collections (Article 4) and Secured Transactions (Article 9)." U.C.C. § 3–103 (2) (O.R.C. § 1303.02(B)—phrased differently, but to the same effect).

Thus, if § 4–303 were applicable, it would be irrelevant that the defense of failure of consid-

eration might be asserted by a drawer of a check before the drawee accepted it.

5. *See, e. g., Wilmington Trust Co. v. Delaware Auto Sales,* 271 A.2d 41 (Del.S.Ct.1970); *Tropicana Pools, Inc. v. First Nat'l Bank of Titusville,* 206 So.2d 48 (Fla.App.1968); *Wright v. Trust Co. of Georgia,* 108 Ga.App. 783, 134 S.E.2d 457 (1963); *Mid-Central Towing Co. v. Tulsa Nat'l Bank,* 348 P.2d 327 (Okl.1960); *Kinder v. Fisher's Nat'l Bank,* 93 Ind.App. 213, 177 N.E. 904 (1931).

6. *See* Annotation, supra n.2, 107 ALR at 1464.

7. Why SNB remitted a cashier's check payable to Valenzuela rather than Banco G is unexplained. The court concludes that that fact is not relevant to the decision in this case, however, for two reasons. First, § 1304.17 does not specify that a cashier's check must be made

Section 1304.17(C) (4–211(3)) provides that

A settlement for an item by means of a remittance instrument or authorization to charge is or becomes a final settlement as to both the person making and the person receiving the settlement

. . . . .

(2) if the person receiving the settlement has authorized remittance by a nonbank check or obligation or by a cashier's check or similar primary obligation of or a check upon the payor or other remitting bank which is not of a kind approved by subsection (1)(b), at the time of the receipt of such remittance check or obligation . . ..

Section 1304.23 (U.C.C. § 4–303), mentioned previously with regard to the acceptance of checks, provides also that knowledge that

would be effective to "terminate, suspend or modify the bank's right or duty to pay an item or to charge its customer's account for the item, comes too late to so terminate, suspend, or modify such right or duty if the knowledge . . . is received . . . after the bank has done any of the following:

. . . . .

(c) settled for the item without reserving· a right to revoke the settlement and without having such right under statute, clearing house rule or agreement; . .

 The record shows that SNB first dishonored the cashier's check on October 10, 1974, for lack of endorsement by Valenzuela.[8] It was not until the second presentment of the cashier's check, on October 28, that SNB asserted failure of consideration as a reason for dishonoring the check.[9]

out to the collectirg bank, rather than the bank's customer; and in any case this cashier's check apparently never left Banco G's hands except when it was transmitted to SNB for payment. Second, Banco G's instruction, as a collecting bank, to SNB to "kindly remit your check as folows [sic] to Banco Ganadero y Agricola, S.A. . ." indicates clearly that the cashier's check was to be made out to Banco G. Banco G should not be penalized for SNB's failure to follow Banco G's remittance instructions.

**8.** In its answers to plaintiff's interrogatories, SNB admits that its sole reason for returning the cashier's check on October 10 was for lack of Valenzuela's endorsement—despite the fact that SNB also received notice of the dishonor of the $29,000 Financial Relations check to Header on October 10.

Banco G argues in its reply brief that Valenzuela's endorsement was not required, pointing to O.R.C. § 1304.11(A) (U.C.C. § 4–205(1)):

A depository bank which has taken an item for collection may supply any indorsement of the customer which is necessary to title unless the item contains the words "payee's indorsement required" or the like. In the absence of such a requirement a statement placed on the item by the depositary bank to the effect that the item was deposited by a customer or credited to his account is effective as the customer's indorsement.

The cashier's check did bear the following notation on the back, however:

*NOTICE*

This check must be individually endorsed exactly as drawn by all persons named thereon as payees.

Thus it is arguable that SNB was justified in returning the check for lack of Valenzuela's endorsement the first time it was presented, on October 10. SNB does not now argue, however, that Valenzuela's subsequent endorsement was not genuine. Nor was it improper for Valenzuela to endorse the cashier's check. See note 10, *infra*. Therefore, the matter is determined to be of no significance in this case.

**9.** On October 28, Peter W. Lemke, an SNB assistant vice president, wrote Samuel L. Mead, Assistant Vice President, International Department, of The Arizona Bank, Phoenix, apparently Banco G's corresponding bank in the United States, confirming a telephone conversation of that date relating to SNB's dishonor of the cashier's check. The cashier's check was returned to Banco G with notice of protest attached. Upon the two subsequent presentations of the cashier's check, it was returned for the reason that Valenzuela's signature did not, in SNB's opinion, compare with a specimen signature attached to an exhibit in a case Header had filed against Valenzuela in El Paso County, Texas. According to SNB's answers to plaintiff's interrogatories, the check was also returned, on advice of counsel, "for the further reason that Valenzuela was subject to restraints in that [Texas] case and any negotiation of the check would subject the holder to defenses." The Texas case is further discussed in note 10, *infra*.

The foregoing facts are reflected in the candid statement of SNB counsel at oral hearing:

Header asked SNB to dishonor the cashier's check on October 25;[10] but clearly under section 1304.23 Header lost the right to require SNB not to honor the original check from Header to Valenzuela when Banco G received the cashier's check. As far as the cashier's check was concerned, Header was not a party to it and had no right to require SNB to dishonor it.[11] Furthermore, SNB's own receipt of notice on October 10 that the $29,000 check from Financial Relations, Inc., credited to Header's account had been dishonored "came too late" to modify the bank's "duty" to pay the Header check to Valenzuela. Indeed, under section 1304.-19(A) (U.C.C. § 4–213(1)), the Header check *was* finally paid. That section provides that

 (A) An item is finally paid by a payor bank when the bank has done any of the following, whichever happens first:

 . . . . .

 (2) settled for the item without reserving a right to revoke the settlement and without having such right under statute, clearing house rule, or agreement;

 . . . . .

. . . I have no factual material at this time which would suggest that at the time Banco G accepted the check made payable by Header General to Ernesto Valenzuela that they were aware of any irregularity with respect to that check or at that moment that they were aware that in point of fact there were not sufficient funds in the Header General check account at SNB to support that instrument. . . .

The Court: When do you contend that they learned there wasn't sufficient consideration?

Mr. Eilers: That would have been on or about October 28, 1974. . . .

**10.** On October 25, when Header asked SNB to dishonor the cashier's check, SNB also received from Header copies of pleadings in a case filed by Header against Valenzuela in El Paso County, Texas, earlier in October, referred to in note 9, *supra*. Among other things, in that case Header sought a preliminary injunction against Valenzuela forbidding him to endorse or negotiate the cashier's check, then in the hands of Banco G. A temporary restraining order sought by Header to that effect was never issued, however, due to Header's failure to post the required bond. Subsequently, on December 3, 1974, Header obtained a default monetary judgment against Valenzuela. Valenzuela

Upon a final payment under subparagraph (2) . . . the payor bank shall be accountable for the amount of the item.[12]

Thus the Header check was finally paid when the settlement for it became final upon Banco G's receipt of the cashier's check. Having finally settled for, and paid, the Header check, SNB could not thereafter deny that the Header check represented adequate consideration for the cashier's check. Therefore, assuming without deciding that Banco G was not a holder in due course of the cashier's check, there was no failure of consideration, and SNB is liable on the cashier's check.

## IV.

### A.

 SNB argues that even if it is liable on the cashier's check, Banco G had an obligation to mitigate damages by charging back against Valenzuela's account for the amount of the cashier's check when it received notice of dishonor by SNB. SNB also argues that Banco G's duty to mitigate

in turn, by default judgment, had the previous default judgment against him overturned by another El Paso County court on March 29, 1976. The inconclusiveness of these proceedings and the absence of either Banco G or SNB as a party to either of these actions renders these proceedings immaterial to the issue of the present case.

**11.** Indeed ordinarily even the purchaser of a cashier's check cannot require the bank issuing the check to countermand it. *See, e. g., Leo Syntax Auto Sales, Inc.·v. Peoples Bank & Sav. Co.,* 6 Ohio Misc. 226, 215 N.E.2d 68 (Tuscarawas Co. C.P. 1965).

**12.** It is not clear from the evidence available in this case whether Banco G granted Valenzuela any provisional credit for the Header check before it received SNB's cashier's check in remittance therefor. If it did, then subsection (C) of O.R.C. § 1304.19 would be applicable:

 If a collecting bank receives a settlement for an item which is or becomes final . . . the bank is accountable to its customer for the amount of the item and any provisional credit given for the item in an account with its customer becomes final.

damages is governed by Mexican law. This latter contention appears to be correct, for Ohio Rev.Code § 1304.02(B) (U.C.C. § 4–102(2)) provides that:

> The liability of a bank for action or non-action with respect to any item handled by it for purposes of presentment, payment, or collection is governed by the law of the place where the bank is located. . . . [13]

At an oral hearing counsel were requested to investigate and supply the court with any necessary illumination with regard to Mexican law if they wished to press the claim that Mexican law differs from the law of Ohio with regard to mitigation of damages in a case such as this one. Thereafter the court issued a written order, indicating that

> Unless the court receives a request from defense counsel on or before June 21, 1976, to present evidence on this matter, it will be presumed that Mexican law does not differ from Ohio law with reference to [the mitigation of damages by Banco G].

In response counsel for SNB informed the court by letter that, upon investigation, "we have concluded that there are no Mexican statutes analogous to Ohio Revised Code §§ 1304.14 and 1304.23(B)," the relevant U.C.C. provisions which will be discussed hereafter. The letter continued:

> We are further advised by Mexican counsel that, under the *Mexican General Law of Credit Institutions,* a bank may not give credit for an item deposited by a customer unless the bank is adequately covered, and a bank may charge back a customer's account for items which are uncollectable.

This court is without means to verify this statement of Mexican law, but even assuming it to be accurate or that it differs from Ohio law, its application must be read in light of this court's previous conclusions. The conclusion that the final settlement process with regard to the Header check to

Valenzuela was completed upon Banco G's receipt of SNB's cashier's check disposes of any contention that Banco G was not "adequately covered" when it allowed Valenzuela to withdraw funds from his account. Thus the final matter requiring attention is Ohio law with regard to mitigation of damages.

**B.**

SNB contends that, as in any other contract action, a plaintiff in a negotiable instruments action has a duty to mitigate damages. We must look first to the Uniform Commercial Code as adopted in Ohio, however, to ascertain whether the provisions of that statute govern as to mitigation in this case. Banco G's bank statement issued to Valenzuela for October 1974 shows that between the time that Banco G received the cashier's check for $73,200, on October 4, 1974, and its first notice of dishonor from SNB on October 28, 1974, Banco G charged checks against Valenzuela's account totaling at least $74,404.12. Ohio Rev.Code § 1304.14 (U.C.C. § 4–208) provides:

> (A) A bank has a security interest in an item and any accompanying documents or the proceeds of either:
>
> (1) in the case of an item deposited in an account to the extent to which credit given for the item has been withdrawn or applied;
>
> . . . . .
>
> (B) . . . For the purpose of this section, credits first given are first withdrawn.
>
> (C) . . . To the extent and so long as the bank does not receive final settlement for the item or give up possession of the item or accompanying documents for purposes other than collection, the security interest continues and is subject to the provisions of sections 1309.01 to 1309.50, inclusive, of the Revised Code, except that

---

**13.** As its plain wording indicates, and the official comment confirms, § 1304.02 also makes it clear that SNB's liability for failure to pay the cashier's check is governed by Ohio law.

(1) no security agreement is necessary to make the security interest enforceable; and

(2) no filing is required to perfect the security interest; and

(3) the security interest has priority over conflicting perfected security interests in the item, accompanying documents, or proceeds.

Ohio Rev.Code § 1304.23(B) (U.C.C. § 4–303 (2)) provides that

Subject to the provisions of division (A) of this section, items may be accepted, paid, certified, or charged to the indicated account of its customer in any order convenient to the bank.

■ It is thus clear that, as Valenzuela wrote checks against his Banco G account, and Banco G accepted those checks, Banco G had the right to charge those checks to Valenzuela's account in any order convenient to it. If, on a first-in, first-out basis, Banco G charged more than $73,200 to Valenzuela's account against the cashier's check as security, it acquired a security interest in the entire check, and the entire amount represented by SNB's cashier's check was permissibly withdrawn from the Valenzuela account before the SNB notice of protest was received.

■ SNB now contends that despite the fact that any charge-back Banco G might make against the Valenzuela account would have had to appropriate funds received after the cashier's check, despite the fact that Banco G had a fully perfected security interest in the cashier's check, and despite the fact that the very receipt of the cashier's check "firmed up" any provisional credit given Valenzuela by Banco G on the original Header check, Banco G had a duty—*to SNB*—to freeze any funds in the Valenzuela account ($38,991.38) as soon as it received notice of dishonor of the cashier's check from SNB. Under the circumstances of this case, the court can perceive no basis for imposing such a duty upon Banco G. Further, SNB has cited no authority that would support the imposition of such a duty. Whether or not it was a holder in due course, Banco G acquired the cashier's check for due consideration. Failure of consideration being the only defense presented to the enforcement of the instrument, and that defense having been found wanting, judgment on instrument, for $73,200 plus accrued interest, at Ohio's legal rate of six percent,[14] is hereby granted in favor of Banco Ganadero y Agricola, S. A.

IT IS SO ORDERED.

**14.** Having concluded that SNB's liability on the cashier's check is governed by Ohio law, see note 13, *supra,* the court rejects plaintiff's claim of entitlement to interest at any higher rate than might be applicable under Mexican law.